IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2024 Session

## STATE OF TENNESSEE v. ZYQIIUS QUADE' BARNES

**Appeal from the Criminal Court for Davidson County**
**No. 2019-B-909     Mark J. Fishburn, Judge**

_____

### No. M2024-00016-CCA-R3-CD

_____

A Davidson County jury convicted the Defendant, Zyqiius Quade' Barnes, of one count of second degree murder and one count of reckless aggravated assault. The trial court sentenced the Defendant to an effective sentence of seventeen years of incarceration. On appeal, the Defendant argues that the trial court erred when it included a "defense of a third person" instruction in its jury charge and when it enhanced his sentence. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Manuel B. Russ (on appeal); and William J. Conway (at trial), Nashville, Tennessee, for the appellant, Zyqiius Quade' Barnes.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball (at oral argument) and William C. Lundy, Assistant Attorneys General; Glenn R. Funk, District Attorney General; and Vincent Wyatt and Chicoya Gallman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I.  Facts

Following the December 25, 2018 shooting that resulted in the murder of Henry Campbell, Jr. and the injury of Shanecia Solomon, a Davidson County grand jury indicted the Defendant for the first degree murder of Mr. Campbell and the aggravated assault with a deadly weapon of Ms. Solomon. The Defendant was tried over several days in August of 2022.

## A. Trial

Several officers from the Metropolitan Nashville Police Department ("MNPD") testified consistently at the Defendant's trial. On December 25, 2018, officers responded to a call regarding a shooting that had occurred at a home on Wimpole Drive. When they arrived, they found the home in disarray, with "a lot of furniture and different items laying around." Ms. Solomon, who was limping as the result of a gunshot wound, said that her boyfriend, Mr. Campbell, had been shot.

Officers found Mr. Campbell's body in the threshold between the kitchen and an adjacent bedroom. Mr. Campbell was pronounced dead shortly after emergency responders arrived. Officers recovered three cartridge casings from the crime scene. The first cartridge casing was found in the kitchen near Mr. Campbell's body, while the second and third cartridge casings were found in the adjacent bedroom. After learning that one of the bullets appeared to have exited Mr. Campbell's body, the officers "spent a lot of time" looking for the resultant projectile but were unsuccessful.

Detective Derry Baltimore arrived at the home on Wimpole Drive at approximately 11:30 p.m. on December 25, 2018. While awaiting a search warrant for the home, he interviewed Tina Swindle, the Defendant's grandmother, who he believed had witnessed the shooting. Detective Baltimore interviewed Ms. Solomon while she was in the hospital and again after she was released. On December 26, the Defendant, accompanied by his mother Dana Solomon,[1] appeared at the MNPD to surrender himself and his firearm to the police.

The State and the Defendant stipulated that the Defendant voluntarily surrendered his firearm on December 26, 2018, and that this firearm was packaged inside a green pillowcase. The firearm was described as a Smith & Wesson nine-millimeter semi-automatic pistol and contained three nine-millimeter cartridges, none of which were in the chamber when it was surrendered.

Ms. Solomon, the Defendant's half-sister, testified that she and Mr. Campbell had been dating for approximately one year before his death. Mr. Campbell and the Defendant were acquaintances who typically only interacted with one another while Ms. Solomon was present.

Ms. Solomon recalled that, on December 25, 2018, she and her family learned that the Defendant's father, Mark Barnes, was terminally ill. Accordingly, Ms. Solomon, the Defendant, and several of their family members quickly arranged to visit Mr. Barnes in Macon, Georgia, where he was hospitalized. The family was to meet at Ms. Swindle's

---

[1] Because Shanecia Solomon and Dana Solomon share the same surname, we will refer to Shanecia Solomon as "Ms. Solomon" and Dana Solomon by her full name, for clarity.

home and ride together to Macon. Mr. Campbell and Ms. Solomon had a young son who intended to accompany the family on the trip. Similarly, the Defendant's girlfriend was to accompany them, with either Ms. Solomon or her mother picking her up on their way to Macon.

Ms. Solomon testified that she, the victim, and her son arrived at Ms. Swindle's home late in the evening and that she entered the house through the back door, which was located near the kitchen and Ms. Swindle's bedroom. Ms. Swindle and the Defendant were already present, and Ms. Solomon and the Defendant began discussing their travel plans. Ms. Solomon stated that Dana Solomon had gone to collect her brother's vehicle, as she feared that her own would not be fit to travel to Macon and back, and that their plan was to collect the Defendant's girlfriend when Dana Solomon returned. Ms. Solomon recalled that the Defendant soon became "overwhelmed" by "everything that was happening" and began requesting that Ms. Solomon go to collect his girlfriend immediately, rather than waiting for Dana Solomon to return. Ms. Solomon refused, stating that she did not have enough gasoline in her vehicle, and an argument ensued between Ms. Solomon and the Defendant. At some point during this argument, Ms. Solomon told the Defendant that she no longer wished to go on the trip at all and that she would drive herself back home, which prompted the Defendant to take her keys from her.

Ms. Solomon stated that the Defendant walked away from her after taking her keys and that she followed him into the kitchen. When she attempted to retrieve her keys from the Defendant, the Defendant resisted and "shoved" her, causing her to fall backwards. Ms. Solomon did not recall whether Mr. Campbell had been inside during her argument with the Defendant but believed that he was alerted by the sound when she fell. Ms. Solomon testified that Mr. Campbell came from behind her, entered the kitchen where the Defendant was, grabbed the Defendant by the shirt, and "shoved" him against the kitchen cabinets. Alarmed, Ms. Solomon moved to stand between the Defendant and the victim to separate them. She testified that she stood facing Mr. Campbell and attempted to push he and the Defendant apart. She estimated that Mr. Campbell was six feet tall and that he was taller than the Defendant. She asked Mr. Campbell not to hurt her brother and that she pushed him toward the exit. Ms. Solomon heard gunshots while pushing Mr. Campbell away. The Defendant shot both her and Mr. Campbell.

After hearing the gunshots, Ms. Solomon retreated into Ms. Swindle's nearby bedroom, where her young son was located. Ms. Solomon, followed by Ms. Swindle, took her son into a nearby bathroom and closed the door, at which point she realized that she, too, had been shot. Leaving her son in Ms. Swindle's care, Ms. Solomon then went to check on the victim, whose body she found lying between the kitchen and the bedroom. Ms. Solomon recalled that the Defendant then stated, "Look what you made me do," took her keys, and drove away in her vehicle.

Ms. Solomon testified that she was treated for a gunshot wound to her right buttock

at Vanderbilt Hospital. She did not remember whether Detective Baltimore visited her while she was in the hospital but stated that "there was a cop or something there the whole time." She recalled that she, along with Ms. Swindle, discussed the shooting with Detective Baltimore after she was discharged.

Ms. Solomon was unsure whether Mr. Campbell attempted to choke the Defendant when he pushed him against the kitchen cabinets. She agreed she had stated that the Defendant had shot her because he was upset that she would not leave immediately to pick up his girlfriend. She testified that she had previously neglected to mention that the Defendant was overwhelmed by the news of Mr. Barnes's illness and stated that any inconsistencies between her trial testimony and previous statements were due to her "deep depression" immediately after the shooting.

On cross-examination, Ms. Solomon testified that the Defendant was very anxious when she arrived at Ms. Swindle's home and repeatedly told her that they needed to leave soon. She clarified that she had been sitting in Ms. Swindle's bedroom and that her keys had been lying beside her on Ms. Swindle's bed when the Defendant took them from her. Ms. Solomon recalled that Mr. Campbell, who was much larger than the Defendant, had placed his hands near the Defendant's neck when he pushed him against the kitchen cabinets. During the altercations, Ms. Solomon was concerned that Mr. Campbell could seriously hurt the Defendant. She estimated that a minute elapsed between when Mr. Campbell pushed the Defendant, and the Defendant shot him. After he shot the victim, the Defendant was "panicking, crying," and pacing the floor.

Ms. Solomon testified that Mr. Barnes passed away a few weeks after Mr. Campbell's death. Ms. Solomon recounted that Mr. Campbell and the Defendant would occasionally eat meals and play video games together, and she did not recall any previous disagreements between the two

Tina Swindle, the Defendant's grandmother, recalled that before the shooting, the Defendant and Ms. Solomon had planned to visit Mr. Barnes. She denied that their discussion devolved into an argument and instead stated that the Defendant and Ms. Solomon frequently raised their voices at each other and that this was just "the way they talk to each other." She did not remember telling Detective Baltimore that the siblings had been arguing for fifteen minutes or that the Defendant had threatened to "blow up" Ms. Solomon's vehicle prior to the shooting. She described the Defendant as anxious and impatient to see his girlfriend and did not recall Ms. Solomon telling the Defendant that she had decided not to go to Macon.

Ms. Swindle stated that the Defendant took Ms. Solomon's car keys during their discussion and that Ms. Solomon asked the Defendant to give them back to her before following him into the kitchen. Ms. Swindle testified that she did not hear or see anything that occurred afterwards because the chair in which she sat was positioned so that she was

unable to see into the kitchen. She nevertheless recalled that Mr. Campbell entered the kitchen at some point after the Defendant and Ms. Solomon left her bedroom, that she heard gunshots soon thereafter, and that Mr. Campbell's body fell so that it lay partially in her bedroom. Ms. Swindle testified that she did not see the Defendant shoot the victim and did not recall speaking with Detective Baltimore after the shooting.

On cross-examination, Ms. Swindle testified that the Defendant had used her cell phone on the night of the shooting to call Dana Solomon, who was "on the phone . . . the whole time all of this was happening." She also stated that the Defendant took her cell phone with him after the shooting.

Dr. Gulpreet Bowman testified that she performed an autopsy of the victim's body. During her autopsy, Dr. Bowman concluded that the victim had been shot two times from more than three feet away, and a third time from closer range, between eighteen and twenty-four inches away. He died as a result of his gunshot wounds.

On cross-examination, Dr. Bowman testified that the victim was approximately five feet and eleven inches tall and weighed approximately 155 pounds.

Detective Baltimore was recalled to testify regarding his December 25, 2018 interview with Ms. Swindle and his December 27, 2018 interview with Ms. Swindle and Ms. Solomon. These interviews were recorded, and portions of the recordings were introduced through Detective Baltimore's testimony. During the December 25, 2018 interview, Ms. Swindle stated that the Defendant was initially supposed to accompany Ms. Solomon to pick up his girlfriend but that they began arguing and "hollering" at one another. Ms. Swindle said she attempted to break up their argument but that the two would not stop. She estimated that the argument lasted for fifteen minutes and described the Defendant as having no patience with Ms. Solomon's refusals to immediately go pick up his girlfriend. She also stated that the Defendant threatened to "blow up" Ms. Solomon's vehicle if she did not comply with his requests.

During the December 27, 2018 interview, Ms. Solomon and Ms. Swindle agreed that the Defendant had not been choked or "grabbed . . . around the neck" during his fight with Mr. Campbell. Ms. Swindle stated that the victim and Ms. Solomon were backing away from the Defendant when he shot them. She recalled that the Defendant told Mr. Campbell to "get off me." She also claimed to have seen the fight and described it, stating that Mr. Campbell "never swung a punch" and instead had "his hands up against [the Defendant]" to hold the Defendant back.

Portions of Ms. Solomon's testimony from the Defendant's February 11, 2019 preliminary hearing were also played for the jury. Ms. Solomon testified that she was "at least a few steps" away from the Defendant when she heard the gunshots. She also stated that Mr. Campbell had begun to walk away from the Defendant before the Defendant shot

him and that she was following him towards Ms. Swindle's bedroom. Though she noted that she had her hands on Mr. Campbell as they walked away from the Defendant, she denied that she was pushing him away from the Defendant and reiterated that Mr. Campbell had begun to retreat voluntarily.

The Defendant testified that his relationship with Ms. Solomon was close and that "out of the times that I wasn't with her, I would be with my girlfriend[,] or I would be in South Nashville." Though the Defendant conceded that he occasionally argued with Ms. Solomon, he stated that they "never had any problems." He testified that he was friends with Mr. Campbell, who he had known for approximately one year prior to his death, and the two did not have any arguments or disagreements.

The Defendant testified that he was visiting a friend on December 25, 2018, when he received a phone call from Dana Solomon informing him that Mr. Barnes had been diagnosed with kidney failure and that his doctors predicted that he would not live much longer. The Defendant explained that his father wished for all his children to come visit him following his diagnosis. He recalled that he was distressed by this information. Dana Solomon took the Defendant to Ms. Swindle's home. Because the Defendant's cell phone was "off" at this time, he used Dana Solomon's cell phone to call Ms. Solomon to plan their trip to Macon. After arriving at Ms. Swindle's home, the Defendant began using Ms. Swindle's cell phone and called his girlfriend and Ms. Solomon repeatedly. He stated that he asked Ms. Solomon on multiple occasions when she would arrive and that Ms. Solomon grew frustrated with him, stating, "I'll get there when I get there."

The Defendant testified that Ms. Solomon arrived at Ms. Swindle's home several hours after he did. Upon Ms. Solomon's arrival, the Defendant asked whether she was ready to leave for Macon, and Ms. Solomon told the Defendant that she needed to eat before leaving. While waiting on Ms. Solomon, the Defendant received a phone call on Ms. Swindle's cell phone from Dana Solomon, whom he placed on speakerphone. During this call, the Defendant began arguing with Ms. Solomon and expressing his belief that she was taking too long. He denied that they yelled at one another. The Defendant recalled that Mr. Campbell entered the house during his argument with Ms. Solomon and complained that their family argued too frequently.

The Defendant stated that he took Ms. Solomon's keys upon her arrival and held them throughout their argument but that he placed them on Ms. Swindle's bed after his argument while he went to the bathroom. Upon returning, the Defendant retrieved the keys, and Ms. Solomon entered the bedroom and attempted to "snatch" them away from him. The Defendant testified that he instinctively moved his arm away from Ms. Solomon and that Mr. Campbell immediately "rushed" towards him, grabbed him, and pushed him against the kitchen cabinets. The Defendant's back hit the counter, and though he attempted to break away from Mr. Campbell, he was unable to move. Mr. Campbell repeatedly asked the Defendant to give him the keys, but the Defendant dropped them when

Mr. Campbell pushed him. The Defendant told the victim that he did not have the keys any longer, but Mr. Campbell continued to press against him. The Defendant stated that Ms. Solomon attempted to move Mr. Campbell away from him. He testified that Mr. Campbell's "strength was getting stronger" and that he felt that he "had no choice but to come on with some keys or I'm just going to be stuck where I'm at." The Defendant therefore retrieved his firearm and shot at Mr. Campbell and Ms. Solomon.

The Defendant averred that he did not intend to hurt anyone or "necessarily do damage" and that he shot because he thought he "couldn't get out of the situation I was in anymore." He stated that Mr. Campbell was standing over him when he shot. He recalled that Mr. Campbell and Ms. Solomon both "kind of ran, but stumbled at the same time" after being shot. After removing her son to the nearby bathroom, Ms. Solomon returned to the kitchen and told the Defendant that he had just shot her, as well. The Defendant did not believe Ms. Solomon until she showed him a "little hole in her pants." The Defendant noticed that he had dropped the keys near where Mr. Campbell's body had fallen, so he retrieved them, his firearm, and Ms. Swindle's cell phone, and then drove away in Ms. Solomon's vehicle. The Defendant called Dana Solomon after leaving, who told him that she had heard a portion of the shooting, as she had still been on speakerphone, and that she had called the police. The Defendant testified that he told Dana Solomon that he had shot Mr. Campbell and Ms. Solomon.

The Defendant then drove to his girlfriend's home and explained to her what had occurred. He attempted to convince her to enter Ms. Solomon's vehicle with him, but she refused, so he drove to his home. After speaking with Dana Solomon, the Defendant decided to surrender himself and his firearm to the police on the following day.

On cross-examination, the Defendant explained that he had purchased his firearm approximately three days before the shooting with the intent to resell it and use the funds to purchase a Christmas present for his girlfriend. He stated that the firearm was already loaded when he purchased it and denied that he loaded it while at Ms. Swindle's home. The Defendant maintained that he brought the firearm with him to Ms. Swindle's home because he wanted to sell it and because he did not want to leave it at his home, where Dana Solomon also lived, as it did not belong to her. He denied that he was impatient with Ms. Solomon because she refused to take him immediately to see his girlfriend or that he threatened to "blow up" her vehicle. He also denied that Ms. Solomon told him they were no longer going to visit Mr. Barnes because of his behavior.

The Defendant testified that, after he took Ms. Solomon's keys, she asked him to return them, and he responded by asking if they were still going to visit Mr. Barnes. He denied that he yelled at Ms. Solomon and stated that this was just "how we talk to each other." He told Ms. Solomon that he would return her keys to her if she got into the vehicle but denied that he attempted to bully her. He also denied that he pushed Ms. Solomon down and instead averred that, when she attempted to grab her keys from him, he pulled

his arm away from her and accidentally "bumped" her. He stated that Mr. Campbell "rushed" towards him as soon as he "bumped" Ms. Solomon. He said that Mr. Campbell did not choke him but instead restrained him by his neck and pushed him against the kitchen cabinets. The Defendant estimated that Mr. Campbell was six feet and three inches tall and recalled that the victim was "much taller" than himself. He denied shooting Ms. Solomon and averred that he did not know how she had been shot.

On redirect examination, the Defendant testified that Mr. Campbell had been previously convicted of domestic assault and had been on probation when he died. The Defendant estimated that he was approximately five feet and five or six inches tall and weighed approximately 120 pounds on December 25, 2018, though he agreed that he had provided a different estimation upon his arrest, when he stated that he was five feet and ten inches tall and that he weighed 130 pounds.

Upon this evidence, the jury convicted the Defendant of second degree murder as the lesser included offense of first degree murder and of reckless aggravated assault as the lesser included offense of aggravated assault.

## B. Sentencing Hearing

At the Defendant's sentencing hearing, the State introduced an investigative report and a presentence report and presented victim impact statements from the victim's parents, Zonna Johnson and Henry Campbell, Sr. The State also introduced a report indicating that the Defendant had used marijuana while released on bond.[2]

Dana Solomon testified for the Defendant and recalled that he lived with her while released on bond, beginning in November of 2021. While released on bond, the Defendant was employed by a temporary employment service, through which he worked in traffic control and at various warehouses. Dana Solomon stated that she and her children had been homeless for several years throughout the Defendant's childhood and that the Defendant lived with Mr. Barnes for two years during this timeframe. She was unaware that the Defendant had owned a gun prior to his shooting of the victim and Ms. Solomon.

The State argued that the Defendant's use of marijuana while released on bond indicated continued criminal conduct and justified an enhanced sentence. Accordingly, the State requested that the trial court impose a twenty-year sentence.

While conceding that his use of marijuana while released on bond indicated additional criminal conduct, the Defendant argued that three mitigating factors should apply to reduce his sentence. First, he argued that he had been highly distressed by the

---

[2] The State also introduced several photographs of the Defendant taken from his Instagram profile and questioned Dana Solomon about them. These photographs are not included in the record.

news of Mr. Barnes's terminal illness and that this distress led to his heightened tension and commission of the offenses. Accordingly, the Defendant requested that the trial court apply mitigating factor (11), that the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct, should apply. T.C.A. § 40-35-113(11). The Defendant also noted that he committed the offense just a few months after he turned eighteen years old and argued that mitigating factor (6), that the defendant, because of his youth, lacked substantial judgment in committing the offense, should apply. T.C.A. § 40-35-113(6). Finally, he requested that the trial court consider his work history and the fact that he surrendered himself and his firearm to the police shortly after committing the offenses. These mitigating factors, he argued, justified a fifteen-year sentence.

The trial court stated that it had considered the evidence presented at trial and the sentencing hearing, the presentence and risk assessment report, the principles of sentencing set forth in T.C.A. § 40-35-103, the parties' arguments, the nature and the characteristics of the criminal conduct, the evidence and information offered on enhancement and mitigating factors, the available statistical information on sentencing from the administrative office of the courts, the Defendant's testimony at trial, the Defendant's potential for rehabilitation, and the general purposes for which the Sentencing Reform Act, as set forth in Tennessee Code Annotated section 40-35-102, was enacted. The trial court concluded that the Defendant was a Range I standard offender and that the appropriate range for his second degree murder was between fifteen and twenty-five years. *See* T.C.A. § 40-35-112(a)(1).

The trial court found that Ms. Swindle and Ms. Solomon's son were present during the Defendant's shooting of the victim and Ms. Solomon and therefore applied enhancement factor (3), that the offense involved more than one victim. T.C.A. § 40-35-114(3). The trial court also considered the Defendant's use of a deadly weapon in the commission of the offenses and applied enhancement factor (9), that the defendant employed a firearm in the commission of the offense. T.C.A. § 40-35-114(9). The trial court found that no other enhancement factors applied.

Though the trial court expressed some concern that the Defendant brought his firearm to Ms. Swindle's home when his stated purpose in going there was to visit his father, it nevertheless concluded that the Defendant's distress in learning of Mr. Barnes's illness and the unusual circumstances giving rise to the Defendant's commission of the offenses justified the application of mitigating factor (11). The trial court also noted that the Defendant worked while released on bond, had generally behaved well while released on bond, and voluntarily surrendered himself and his firearm to the police shortly after committing the offenses. After considering all the enhancement and mitigating factors, the trial court imposed a seventeen-year sentence for the second degree murder conviction and a four-year sentence for the reckless aggravated assault conviction, to run concurrently. The Defendant timely filed a motion for new trial, which was denied. This timely appeal

followed.

## II. Analysis

On appeal, the Defendant argues that the trial court erred when it instructed the jury on "defense of a third person," and when it enhanced his sentence for second degree murder. We will consider these issues in turn.

## A. Jury Instruction

The Defendant first argues that the trial court erred when it instructed the jury on "defense of a third person" based on Mr. Campbell's conduct. He contends that the defense is intended to be a defense against prosecution for a defendant rather than a means of justifying a victim's conduct, relying on this court's opinion in *State v. Grant*, No. W2017-00936-CCA-R3-CD, 2018 WL 1876339 (Tenn. Crim. App. Apr. 18, 2018), *no perm. app. filed*. The Defendant further argues that this error was prejudicial because it impermissibly shifted the burden of proof from the State to the Defendant. The State responds that because the *Grant* court found that the defendant's jury instruction claim was waived, its analysis and assignment of error notwithstanding waiver constitutes nonbinding dicta. The State further argues that any error in the trial court's instructing the jury was harmless.

During a jury-out hearing at the conclusion of the second day of trial, the State argued that Ms. Solomon's testimony that the victim came to her defense following her argument with the Defendant warranted a defense of a third person instruction to prevent the jury from being "confused about the fact that [Mr. Campbell] had a right to then go and defend his girlfriend." Following a discussion between the Defendant and the State regarding whether the Defendant had acted unlawfully by taking Ms. Solomon's keys or pushing her, the trial court stated that it would include a self-defense instruction because that had been fairly raised by the proof. The trial court further stated, "I think it's up to the jury to decide whether or not they think it is reasonable for [Mr. Campbell] to intervene," remarking that the victim's response to the situation was "reasonable under the circumstances" and "not unlawful." During another jury-out hearing at the close of all proof and prior to closing arguments, the State contended that the evidence did not support the Defendant's theory that Mr. Campbell had been the first aggressor by coming to Ms. Solomon's defense. The trial court responded that it would "leav[e the] question" of whether the victim acted as the first aggressor "up to the jury" and reasoned that the evidence necessitated a jury instruction on defense of a third person because "if the jury first finds that [the victim] had a reasonable belief that his girlfriend, the third party, was going to be harmed, then it negates the self-defense."

During the jury charge, the trial court instructed the jury on self-defense, the language of which largely aligned with the pattern jury instruction. *See* Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim 40.06. The trial court then provided the following instruction on

defense of a third person:

> The use of force against the [victim] would not have been justified if [the Defendant] provoked the [victim's] use[] or attempted use of unlawful force unless he abandoned the encounter or clearly communicated to the [victim] the intent to do so and the [victim] nevertheless attempted to use unlawful force against him. The acts of the [victim] are not unlawful if the [victim's] use of force was done in defense of a third person. The [victim] would be justified in using force against the Defendant to protect a third person if, under the circumstances as the [victim] believed them and consistent with the principles of self-defense as set out in these instructions, the [victim] believed the intervention was immediately necessary to protect a third person from use of unlawful force from the Defendant.

> If the State unanimously establishes beyond a reasonable doubt that the [victim] lawfully used force to protect a third person against the use or attempted use of force by the Defendant, then the Defendant cannot avail himself of the defense of self-defense. Force means compulsion by use of physical power or violence. Violence means evidence of physical force unlawfully exercised so as to damage, injure[,] or abuse. Physical contact is not required to prove violence. Serious bodily injury and bodily injury are defined the same as the terms were previously defined in Count 2. You are to refer to these definitions in your deliberation of this offense.

> If the State fails to establish unanimously that the [victim] acted in lawful defense of a third person, then the burden is upon the State to prove beyond a reasonable doubt that [the Defendant] did not act in self-defense. To convict [the Defendant], the State must prove beyond a reasonable doubt that he did not act in self-defense if you determine the [victim] did not lawfully act in defense of a third person. If from all the facts and circumstances you find he acted in self-defense or if you have a reasonable doubt as to whether he acted in self-defense, you must find him not guilty.

*See also* Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim 40.07.

A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary

for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

This court reviews challenged jury instructions "in the context of the charge as a whole." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014) (citing *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008), *Hodges*, 944 S.W.2d at 352). Even if a trial court errs when instructing the jury, such instructional error may be found harmless beyond a reasonable doubt. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). Furthermore, an erroneous or inaccurate jury charge, rather than an omitted jury charge, may be raised for the first time in a motion for new trial. *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Cim. P. 30(b)).

Statements made by the court which are not necessary to the determination of the issue at hand are referred to as dicta and, though persuasive, are not binding precedent in future cases. See *Abdur'Rahman v. State*, 648 S.W.3d 178, 197 (Tenn. Crim. App. 2020) (citing *Staten v. State*, 191 Tenn. 157, 232 S.W.2d 18, 19 (Tenn. 1950)). As the State notes, the *Grant* court was not required to address the merits of the defendant's jury instruction claim because it concluded that she had waived it due to inadequate briefing. *Grant*, 2018 WL 1876339, at *9 (citing Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7)). Now that the question is properly before this court, we find *Grant* persuasive and adopt its well-reasoned analysis.

Here, as in *Grant*, the trial court instructed the jury on self-defense before providing a defense of a third person instruction. During the jury-out hearings, the trial court stated that it did so because it believed this instruction would assist in determining whether the Defendant acted as the first aggressor in its consideration of the Defendant's theory of self-defense. Thus, the trial court sought to clarify that if the jury found that the victim had acted in lawful defense of Ms. Solomon, then it would be precluded from finding that the Defendant had acted in self-defense to protect himself from an unlawful use of force. *See* Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim 40.06. However, the defense of a third person pattern jury instruction "was meant to be a defense to prosecution for a defendant and not a means for justifying a victim's conduct." *Grant*, 2018 WL 1876339, at *11 (citing Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim 40.07); *see also* T.C.A. § 39-11-612, Sentencing Comm'n Cmts. (codifying defense of a third person as an enumerated defense justifying a defendant's conduct relative to a third person under the same standards as self-defense). Accordingly, the trial court erred in instructing the jury on defense of a third person.

The question then becomes whether the trial court's instruction prejudiced the

Defendant. "In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013) (citations and internal quotation marks omitted). The Defendant contends that the error was prejudicial because it misled the jury as to the applicable law and impermissibly shifted the burden of proof from the State to the Defendant. The State responds that no reasonable jury would have accepted the Defendant's self-defense theory, and therefore any error resulting from the erroneous jury instruction was harmless.

First, the record does not support the Defendant's claim that the jury instruction impermissibly shifted the burden of proof to the Defendant. To the contrary, the trial court repeatedly admonished the jury that it was the State's burden to prove beyond a reasonable doubt that the Defendant did not act in self-defense. In the context of the self-defense instruction, the trial court also instructed the jury that the State had the burden of proving that the victim acted in lawful defense of a third person. These repeated reminders of the State's burden of proof do not support the Defendant's claim and, further, served to mitigate "any adverse consequences from the erroneous charge." *State v. Belser*, 945 S.W.2d 776, 783 (Tenn. Crim. App. 1996); *see also Grant*, 2018 WL 1876339, at *11. Additionally, the erroneous jury charge was provided in the context of an otherwise proper jury instruction on self-defense, and the trial court stated that its intent in including the instruction was to clarify the concepts of the victim's use of unlawful force for the jury. *See* Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim 40.06.

We also agree with the State that the evidence adduced at trial did not support a reasonable jury's acquittal on the basis of self-defense. The Defendant and Ms. Solomon both testified that the victim pushed the Defendant against the kitchen cabinets and restrained him by his throat but did not choke him. Ms. Solomon testified at the Defendant's preliminary hearing that she and the victim were retreating when they were shot, and though the Defendant testified that the victim was still standing over him when he fired his firearm, Dr. Bowman's autopsy report indicated that the victim was shot twice in the back and once in the back of his left arm, which tends to support the former testimony rather than the latter. Further, though the Defendant testified that he feared being "stuck" in the situation and that the victim could harm him, the record does not establish that he was in imminent threat of death or serious bodily harm. Thus, we cannot say that the proof would have supported a reasonable jury's acquittal based on self-defense; accordingly, the trial court's erroneous instruction was harmless beyond a reasonable doubt. *See State v. Perrier*, 536 S.W.3d 388, 405 (Tenn. 2017) (finding an erroneous jury instruction harmless where "no reasonable jury would have accepted the defendant's self-defense theory"). The Defendant is not entitled to relief.

## B. Sentencing

The Defendant also argues that the trial court erred in enhancing his sentence for his

second degree murder conviction. He contends that the trial court inappropriately applied enhancement factor (3) by considering Ms. Swindle and Ms. Solomon's son as additional victims. He also argues that the trial court erred in its weighing of the enhancement and mitigating factors, which he maintains should have yielded a fifteen-year sentence. The State responds that the trial court did not abuse its discretion and properly imposed a within-range sentence.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id*. A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id*. So long as there are other reasons consistent with the purposes and principles of sentencing, a sentence within the appropriate range should be upheld. *Id*.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

The Defendant claims that the trial court inappropriately considered Ms. Solomon's son and Ms. Swindle as additional victims to his offenses in applying enhancement factor (3), that the offense involved more than one victim. T.C.A. § 40-35-114(3). He further argues that the trial court erred by not considering the mitigating proof he presented and reducing his sentence to the minimum of fifteen years. The State concedes that the trial court misapplied enhancement factor (3) but argues that the sentence was otherwise compliant with the purposes and principles of the Sentencing Act.

The trial court, after considering the evidence presented both at trial and at the sentencing hearing, the presentence report and the risks and needs assessment, the principles of sentencing, the nature and characteristics of the Defendant's conduct, the parties' arguments for sentence enhancement and mitigation, the Defendant's potential for rehabilitation, and the relevant statistical information provided by the administrative office of the courts, sentenced the Defendant as a Range I standard offender to a within-range sentence of seventeen years for his conviction for second degree murder. *See* T.C.A §§ 39-13-210(c)(1), 40-35-112(a)(1). The trial court applied enhancement factors (3) and (9), that the defendant employed a firearm during the commission of the offense, as well as mitigating factor (11), that the defendant committed the offense under unusual circumstances, determining that the seventeen-year sentence was proper. T.C.A. §§ 40-35-114(9), -113(11).

In applying enhancement factor (3), the trial court concluded that Ms. Solomon's son and Ms. Swindle were "just around the corner" and "within the zone of danger" when the Defendant killed Mr. Campbell, noting that "there were four people that could have died that night." However, the Tennessee Supreme Court has held that enhancement factor (3) is inappropriately applied to convictions of offenses committed against a specific, named victim. *See State v. Imfeld*, 70 S.W.3d 698, 705-706 (Tenn. 2002) (finding that enhancement factor (3) is "limited to an offense involving more than one (1) victim.") (internal quotation marks omitted) (citing *State v. Lewis*, 44 S.W.3d 501, 508 (Tenn. 2001); *see also State v. Foster*, No. E2007-01585-CCA-R3-CD, 2009 WL 3335580, at *18 (Tenn. Crim. App. Oct. 16, 2009) (holding that application of enhancement factor (3) to a conviction for second degree murder was inappropriate), *perm. app. denied* (Tenn. Apr. 14, 2010). Because the indictment in this case named a specific victim and charged the Defendant with the first degree murder of that victim and because the Defendant was convicted of the lesser included offense of second degree murder, the trial court inappropriately applied enhancement factor (3). However, the misapplication of enhancement factor (3) does not serve to invalidate the Defendant's sentence, and because the trial court otherwise complied with the purposes and principles of sentencing and appropriately applied enhancement factor (9) and mitigating factor (11), we continue to afford it the presumption of reasonableness. *Bise*, 380 S.W.3d at 706.

The Defendant contends that the trial court should have imposed the minimum

sentence of fifteen years because he "had no prior criminal record, his lone enhancement factor was improperly applied, and he presented mitigation evidence that the trial court accepted." However, the trial court also found that "the Defendant employed a firearm" in the commission of the offense, remarking that "[o]bviously, that was the instrument used to result in the death of one of the victims," and applied enhancement factor (9). Thus, the Defendant's argument becomes a disagreement with the weight the trial court afforded to the enhancement and mitigating factor. It is well-settled that "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal" since the 2005 amendments to the Sentencing Act. *Id.*; *see, e.g.*, *State v. Cochran*, No. E2022-00600-CCA-R3-CD, 2022 WL 17960180, at *13 (Tenn. Crim. App. Dec. 27, 2022), *perm. app. denied* (Tenn. May 10, 2023); *State v. Johnson*, No. W2020-00260-CCA-R3-CD, 2021 WL 1627077, at *15 (Tenn. Crim. App. Apr. 17, 2022), *no perm. app. filed*; *State v. McIntire*, No. E2020-01483-CCA-R3-CD, 2021 WL 2420158, at *3 (Tenn. Crim. App. June 14, 2021), *no perm. app. filed*; *State v. Bergum*, No. M2016-02399-CCA-R3-CD, 2018 WL 4462652, at *3 (Tenn. Crim. App. Sept. 18, 2018), *perm app. denied* (Tenn. Dec. 5, 2018). The trial court did not abuse its discretion in imposing the within-range sentence of seventeen years. Accordingly, the Defendant is not entitled to relief.

## III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE